**WHITFIELD & SHESHUNOFF, Inc.,**
Plaintiff,

v.

**FAIRCHILD ENGINE & AIRPLANE CORPORATION, Defendant.**

**FAIRCHILD ENGINE & AIRPLANE CORPORATION, Plaintiff,**

v.

**WHITFIELD & SHESHUNOFF, Inc., and**
Marshall G. Whitfield, Defendants.

Civ. A. 14874, 17385.

United States District Court
E. D. New York.

Nov. 29, 1957.

Milton E. Schattman, New York City, and Gibson Yungblut, Cincinnati, Ohio, for Whitfield & Sheshunoff, Inc. and Marshall G. Whitfield.

Brumbaugh, Free, Graves & Donohue, New York City, Walter H. Free and John F. Neary, Jr., New York City, of counsel, for defendant, Fairchild Engine & Airplane Corp.

REEVES, District Judge.

While the pleadings and testimony in the above cases are extensive, yet the issue is simple and easily stated. The question involved is the right to use a patented process or processes in causing aluminum to adhere to steel or other metals. Both parties have rights as licensees, but in different fields. Fixing the boundaries of these fields constitutes the issue and judicial problem. The process or processes had been designated by the parties with the agreed name of "Al-Fin."

The plaintiff, Whitfield & Sheshunoff, Inc., in No. 14,874, filed its action in October, 1954. It complained in equity and sought an injunction against the defendant to restrain it from holding out to the public and negotiating licenses in its claimed field, which was, by agreement, in the field of strip, sheet and wire, but asserted by plaintiff to extend to the applications of said processes before, as well as after, fabrication.

Plaintiff further sought to have an adjudication "that the exclusive rights of

the plaintiff attach to all articles made of sheet, strip or wire, whether such 'Al-Fin' processes be applied before or after fabrication."

There was a further prayer for an accounting for such use as the defendant might have made of the said "Al-Fin" processes in the field of sheet, strip and wire, "whether such processes be applied before or after fabrication," and that the defendant pay over to the plaintiff the amount found to be due upon such accounting.

To this action the defendant interposed a denial in part, particularly as to its alleged misuse or infringement upon plaintiff's license. It averred an estoppel and also set forth a counterclaim based upon the alleged misuse by plaintiff of what it treated as a very limited license in the use of the so-called "Al-Fin" process.

Subsequently, and as a procedural maneuver, the defendant filed its action, numbered 17,385, wherein it charged that Whitfield & Sheshunoff, Inc., and one Marshall G. Whitfield had infringed sundry patents owned by the plaintiff, and that such infringement had been accomplished "under the purported and exaggerated guise of a license from plaintiff * * *."

It appears from the pleadings, the statement of counsel, and the evidence, that the controversy turns or depends on the meaning of the words, "in the field of aluminum-coated metal sheet, strip and wire." To understand these words, it is necessary to set forth facts as gleaned from the pleadings and the testimony:

The plaintiff in the original case is a corporation formed by Marshall G. Whitfield and Victor Sheshunoff. By assignment it holds all the rights enjoyed by the individuals in a license previously granted for the so-called "Al-Fin" process.

Prior to December 30, 1940, the said Whitfield and Sheshunoff were employed by the Reynolds Metals Company as metallurgists. For that company, by their contract of employment, they developed and secured sundry process patents involving the "*production of continuous lengths of coated metal for use in the production of fabricated articles.*" (Emphasis mine.) These patents referred to "the metal coating of elongated strips, such as wires, bands, sheets, etc." During the same period the named metallurgists obtained for their employer a patent for an invention that "relates to the production of aluminum treated articles of iron and steel."

The latter patent was applied for on September 21, 1936 and issued August 1, 1939. One of the claims is expressive:

"1. The method of treating ferrous article with aluminum which includes the steps of thoroughly cleaning the surface of the article, immersing the cleaned article in a bath of molten aluminum, and then heating the coated article in the open air to a temperature above the melting point of aluminum until no molten aluminum can be observed on the surface of the article."

Because of the process or processes involved in these productions negotiations were commenced by the defendant for the employment of said metallurgists, and, with the thought of using their process or processes in airplane motors. It appeared from the evidence that the defendant was using in-line cylinders instead of the usual radial cylinders in airplanes. Other methods had previously been used in cooling overheated cylinders in motors, but, while it was doubtless known that aluminum was a distributor of heat, no process had been discovered for securely binding aluminum to steel and iron and other metals. The named metallurgists had discovered and worked out an effective process.

On December 30, 1940, they made a proposal to the defendant, which, on January 10, 1941, was accepted. Such proposal and acceptance contemplated a subsequent and more formal contract. After sundry drafts and considerable

negotiation a formal contract was entered into on October 14, 1941. This contract contained the following important recitals:

"Whereas, the parties of the first part represent that they are the exclusive owners of certain processes, apparatus, and products relating to the application and adhesion of aluminum * to other metals, and further represent that such processes, apparatus and products will lend themselves to the application and adhesion of aluminum fins to cylinders of aircraft engines, as more fully illustrated by the samples heretofore submitted by them to Fairchild; and

"Whereas, Fairchild, engaged in the aircraft business, including the manufacture and sale of aircraft engines known as 'Ranger Aircraft Engines,' *desires to acquire the right to use the said processes, apparatus and products, and all improvements thereon, in the manufacture of its aircraft engines, and also desires to promote the further development and improvement of said processes, apparatus and products, and the development and improvement of other inventions relating to the application of aluminum to other metals; * * *.*" (Emphasis mine.)

" * For purposes of this agreement, the term 'aluminum' as used herein shall be construed to include metallic aluminum, its alloys, mixtures including aluminum, and other metals or alloys having characteristics rendering them suitable for the purpose described in this agreement."

The foregoing aptly sets forth the interest of the parties in the application of the processes mentioned.

By the agreement accepted on January 10, 1941, a corporation was to be formed, and, pursuant to such agreement, had been formed. This corporation was entitled "Al-Fin Corporation," and to it, by agreement of the parties, all rights in the processes, both then existing and to be developed, were to be transferred to the said Al-Fin Corporation. This means that not only the existing rights, but such rights as might be developed by the parties, would be transferred to Al-Fin Corporation. Other terms of the contract need not be mentioned as they are not pertinent.

By article "Eighth" of the contract Al-Fin agreed:

"(c) To grant, and it does hereby grant and confirm, unto Fairchild Engine and Airplane Corporation, its successors and assigns, an irrevocable, non-exclusive license, royalty free, to manufacture in any of its plants or factories and in such plants or factories as it may hereafter own or lease, and to use, vend and lease throughout the United States of America and its possessions and in any foreign country, (1) aircraft engines, aircraft type engines and/or parts thereof; (2) aircraft and/or parts thereof; and (3) apparatus or equipment and/or parts thereof, *intended for use or application to, on or with aircraft, embodying, utilizing, comprising or including any and all of the processes, and/or apparatus and/or products, and improvements, thereon, whether or not patented or patentable which Al-Fin owns, or may be entitled to own, in whole or in part, pursuant to and by virtue of the respective assignments herein contained, and under and by virtue of any and all patent rights, including Letters Patent of the United States and foreign countries and applications therefor, which Al-Fin, its successors and assigns, shall at any time own or become entitled to own, provided that Fairchild shall not have the right under said license to manufacture or process cylinders or other engine parts for other manufacturers, or engines or other aircraft parts other than Fairchild's without Al-Fin's consent, * * *.*"* (Emphasis mine.)

And, by subparagraph (d) of said Article "Eighth", it was provided:

"(d) At Al-Fin's option but not later than January 10, 1943, to grant to the parties of the first part, jointly, an irrevocable, exclusive license, royalty-free, to manufacture, use and vend throughout the United States of America and its possessions and in any foreign country, apparatus, equipment, appliances and chattels of any and all kinds and descriptions, and any parts thereof, under and by virtue of any and all of the processes, and/or apparatus and/or products, and improvements thereon, whether or not patented or patentable, which Al-Fin owns, or may be entitled to own, pursuant to and by virtue of the respective assignments herein contained, and under and by virtue of any and all patent rights, including Letters Patent of the United States and foreign countries, and applications therefor, which Al-Fin, its successors and assigns, shall at any time own or become entitled to own, and to grant sublicenses for such manufacture and sale, *provided, however, that there is expressly excepted from such license the right to manufacture, use, vend, and lease, products, apparatus and parts (including the right to use such processes for the manufacture or treatment of products, apparatus and parts), which are applicable to, or used, or intended for use, in or by the aviation industry and the automotive engine industry, and also internal combustion engines and finned heat exchangers, and parts for use or application thereto or thereon."* (Emphasis mine.)

On July 10, 1942, an agreement was entered into between the defendant and Al-Fin Corporation. This related to or affected the said metallurgists, and, without objection, was introduced in evidence.

This agreement provided, by paragraph "4" thereof, that:

"Article Third of the Memorandum of Agreement made October 14, 1941, by and between Fairchild Engine and Airplane Corporation, Al-Fin and Messrs. Whitfield, Sheshunoff and Markel, shall be, and hereby is, amended to read as follows: * * *."

By this amendment Fairchild assumed an additional obligation to transfer any acquired patent rights in the processes to Al-Fin. Since this amendment did not affect the rights of the plaintiff, it is unnecessary to set forth its provisions in detail.

A few days thereafter, to-wit, on August 27, 1942, there was a further Memorandum of Agreement accomplished by a letter addressed to Al-Fin Corporation. It was signed by the metallurgists and imposed upon them practically an identical obligation assumed by the defendant by the Memorandum of Agreement of July 10, 1942. It contained, moreover, the following important provision:

"g) Paragraph (d) of Article Eighth of the Memorandum of Agreement dated October 14, 1941, shall be and hereby is amended in the following respects: (1) the license to be issued thereunder shall be issued to us; (2) such license shall be limited to the field of aluminum-coated sheet, strip and wire and shall not become issuable or effective during such period as we shall both be employed by you, but thereafter it shall be promptly issued on demand by either of us as of the date when we, or either of us, shall have left your employ; (3) you shall have the right to issue nonexclusive licenses within the field contemplated by our license during the period before our license shall become issuable; and (4) our license shall be an exclusive license for the field specified except that it shall be subject to any outstanding-

licenses that have been issued by you as herein provided."

By this Memoranda, the contract of October 14, 1941 relating to these subject matters otherwise remained in full force and effect.

Then, on September 1, 1943, the parties entered into a further formal contract. By that contract, among other things,

"6. The agreements of October 14, 1941, July 10, 1942 and August 27, 1942, by and between all or some of the parties hereto are hereby terminated and superseded except that Article(s) * * * and Eighth * * * (d) (as amended by paragraph (g) of letter agreement of August 27, 1942) of the Memorandum of Agreement dated October 14, 1941 * * * shall continue in full force and effect in accordance with their terms, except as herein expressly restricted or modified and except that Whitfield and Sheshunoff shall have the exclusive right, effective as of the date hereof, to license others in the field of aluminum-coated sheet, strip and wire."

It should be stated here that in some of the original drafts for the Memorandum of Agreement of August 27, 1942, the word "a" was suggested to be used before "field of aluminum-coated sheet, strip and wire," but, by agreement of the parties, the definite article "the" was inserted instead in the contract.

Upon the foregoing facts, it is the contention of the plaintiff that paragraph (d) of Article Eighth in the contract of October 14, 1941, was left unchanged as to the terms of the license (by Al-Fin or its successors) to grant to the plaintiff's assignors the right " * * * to manufacture, use and vend throughout the United States of America and its possessions and in any foreign country, apparatus, equipment, appliances and chattels of any and all kinds and descriptions, and any parts thereof, under and by virtue of any and all of the processes, and/or apparatus and/or products, and

improvements thereon, whether or not patented or patentable, which Al-Fin owns, or may be entitled to own, etc."

■ 1. Wholly aside from the voluminous evidence as to the attitude and conduct of the parties in construing the several contracts or licenses, it seems obvious that a proper construction of the final contract of September 1, 1943, would be as follows:

" * * * that Whitfield and Sheshunoff shall have the exclusive right, effective as of the date hereof, to license others in the field of aluminum-coated sheet, strip and wire", such as apparatus, equipment, appliances and chattels of any and all kinds and descriptions, and any parts thereof.

■ This interpretation seems reasonable in view of the fact that "apparatus, equipment, appliances and chattels" might be involved in heavier articles. Cylinder barrels could be characterized as "chattels, apparatus, equipment or appliances." It seems clear from the evidence, as well as from the contracts, that it was the purpose of plaintiff's assignors to have "apparatus, equipment, appliances and chattels" made out of lighter materials, such as aluminum-coated sheet, strip and wire, and that the defendant would have a right for the heavier materials, such as motor engines and airplane engines. This seems to be a reasonable interpretation in the light of all the testimony.

■ Moreover, the terms of an explicit contract when fully set out cannot be modified by indefinite expressions. 17 C.J.S. Contracts § 374, pp. 859–860. In Popplewell v. Jones, 202 Okl. 185, 211 P.2d 283, loc. cit. 285, the Supreme Court of Oklahoma quoted from Continental Supply Co. v. Levy, 121 Okl. 132, 247 P. 967, as follows:

" 'One claiming that a contract modifies a prior contract must show that the latter contract is definite and certain as to the terms of modification, and the modification extends only so far as the terms are definite, certain, and intentional.' "

2. According to the evidence the defendant endeavored to limit the right of plaintiff's assignors to aluminum-coated sheet, strip and wire, for commercial purposes only. If this be a proper construction of the contract, then the plaintiff and its assignors were in grave danger of an encroachment upon the patents acquired by Reynolds Metals Company in the years 1939 and 1940. Moreover, the patent for a process or product acquired by Reynolds Metals Company issued in 1939 and 1940 provided for the protection of continuous lengths of coated metals, and for the metal coating of elongated strips, such as wires, brands, sheets, etc. The first of these patents provided for "the production of continuous lengths of coated metal for use in the production of fabricated articles, * * *." It should be noted here that the patent issued to the Reynolds Metals Company under date of August 1, 1939, was for an invention that "relates to the production of aluminum treated articles of iron and steel."

It would be difficult in the light of all the testimony to find that the plaintiff is limited in its license rights to the production of articles such as sheet, strip and wire, which are clearly within the patent rights of Reynolds Metals Company. However, Reynolds Metals Company was only interested commercially in aluminum-coated sheet, strip and wire, and the plaintiff's assignors were accorded rights by Reynolds under the patent issued August 1, 1939 to manufacture aluminum-coated articles.

3. It is admitted by the defendant in its answer that, "it has granted licenses under, and holds itself out to the public and to the trade as the exclusive owner and licensor of, said "Al-Fin" processes as applied to articles and chattels after fabrication from, inter alia, sheet, strip and wire." Quite clearly this is an acknowledgment that the defendant has trespassed upon the plaintiff's license right as alleged in its complaint.

4. According to the overwhelming preponderance of the evidence, the plaintiff and its assignors were careful and diligent in the grantings of sublicenses to acquaint the sublicensee in each case with its contractual arrangements, and that its actions were within the terms of the license contracts. The license it holds or is entitled to hold is derived from the defendant or its predecessor. There is no evidence that it has granted sublicenses beyond the terms of its contractual arrangements with the defendant.

5. Several patents enumerated in the defendant's answer, as well as those specified in its independent action, are not defensive in the original action, nor do they constitute the basis for a claim against the plaintiff in the defendant's action. In the first place, according to a preponderance of the testimony, the plaintiff was entitled to the patents mentioned in the defendant's answer and counterclaim. They were independently discovered and in line with the license of plaintiff's assignors. In the second place, the patents alleged to have been infringed by the plaintiff, in defendant's action, were patents involving matters different from the process patent in controversy.

In the same connection defendant has sought to claim infringement of the Stevens patent now owned by the defendant. This patent was issued on May 1, 1951, and the first words of the patent are apposite:

"This invention relates to bimetallic articles and has particular reference to the insertion of a piston ring band into an aluminum piston."

The first claim:

"A piston for an internal combustion engine, comprising a cylindrical body portion formed of a light metal of relatively low strength, a band of a high strength ferrous metal encircling said body portion and embedded therein and a film of an alloy of the body portion metal and the ferrous metal of the band interposed between the body and the abutting

band surfaces for bonding them together."

Other claims referred to "aluminum" and "aluminum base." It is apparent that this was an invention of a device or apparatus and not of a process. The courts have held that though patents for a "process" and for a "machine" are related and are often founded in the same mental concept, yet, in substance, they are independent and radically different, and while a process may be altogether new, the machinery suitable to perform it may not be new or patentable. United States Gypsum Co. v. Consolidated Expanded Metal Cos., 6 Cir., 130 F.2d 888.

An inspection of the Stevens patent discloses, as stated, that it is for an article and not a process. It would follow that it could not be infringed by use of a patented process for which the plaintiff was entitled to a license in the field of aluminum-coated sheet, strip and wire. However, the patent was not timely interposed as a plea, and, notwithstanding the present and rather cursory view that it was not infringed, yet the application to plead it will be disallowed. If the Stevens' patent involves the use of aluminum (which it does) in its bimetallic piston, then it may be in conflict with No. 2,167,701, issued to Reynolds Metals Company by assignment from plaintiff's assignors and its validity could be properly challenged.

6. The defendant has invoked the doctrine of laches because of the time elapsing from the making of the contracts until suit was filed. The evidence shows that there was a continuing controversy leading up to a date approximately two years before suit was filed. Offers were made to effect a settlement, and even it was suggested that the parties resort to arbitration.

It is the rule that the question of laches is to be determined in the light of the circumstances of the particular case. 30 C.J.S. Equity § 115, p. 528. And, while lapse of time or delay in enforcing the right is an element of laches, yet such delay does not of itself constitute laches. 30 C.J.S. Equity § 116, p. 531. See also Seligson v. Weiss, 222 App.Div. 634, 227 N.Y.S. 338, loc. cit. 342. The plea of laches is unavailing.

7. By the contract of September 1, 1943, there was no prohibition against assignment. The provisions of the contract for the consent to an assignment by the defendant in the agreement of October 14, 1941 was deleted from the later contract.

It would follow from the foregoing that the plaintiff is entitled to recover as prayed in its complaint, and that the defendant, in its action numbered 17,385, is not entitled to the relief it seeks.

Counsel for plaintiff in case numbered 14,874 will prepare and submit a proper journal entry or decree supplemented with proposed Findings of Fact and Conclusions of Law. And counsel for defendant may, in like manner, submit a proposed decree with Findings and Statements which counsel believes should be entered or given on behalf of defendant.